**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**HELEN MARIE RICE**                                                                                          **PLAINTIFF**

**v.**                                                       **CIVIL ACTION NO.: 1:10-CV-188-SA-DAS**

**CNCL, LLC d/b/a THE CARRINGTON**                                              **DEFENDANT**

**<u>MEMORANDUM OPINION</u>**

Before the Court is a Motion for Summary Judgment [34] filed by Defendant CNCL, LLC d/b/a The Carrington. For the following reasons, the Court grants the Motion.

**BACKGROUND FACTS & PROCEDURAL HISTORY**

The Carrington is a skilled nursing facility, colloquially known as a nursing home, located in Starkville, Mississippi. Plaintiff Helen Rice, an African-American female, began working for The Carrington as a Certified Nursing Assistant ("CNA") in 2003. In 2009, Rice worked on the "bath team" with Jacqueline Malone, another African-American female. At this time, the bath team consisted of two CNAs working five days a week with the weekends off. All other CNAs at the Carrington worked on the floor on a rotating seven-day shift.

The bath team was tasked with assisting residents who were unable to shower or bathe themselves. When such a resident needed a bath, he or she would be undressed in their room by a floor CNA. A member of the bath team would then cover the resident with a sheet or robe, transport them to the bathing facility, bathe the resident, and return the resident to his or her room. The resident would then be dressed by a a floor CNA. If a resident needed a bath over the weekend, a floor CNA would perform the bath. According to Rice, being on the bath team (as opposed to performing "floor" CNA duties) was voluntary and "whoever wanted to apply for it would apply for it" but "most of the time didn't nobody want it." Rice stated that she "liked the job because I was

off on weekends."

In April of 2009, Judy Otts was hired as The Carrington's Director of Nursing. Otts implemented several changes affecting the bath team's scheduling and responsibilities. Otts decided to change the bath team from working five days a week to seven days a week in order to provide for better continuity of care. Under this new seven-day schedule, a third CNA was added to the bath team (although only two worked on a given day), and the members of the team rotated, either working three days on and two off, or four days on and one off, depending on the month.[1] Employees regularly moved on and off the bath team. When asked what employees she worked with after the bath team moved to a three-person rotation, Rice stated, "I don't have a clue. It's been so many. I really don't know." Otts also tasked the bath team with performing "bed baths" for residents who were too ill to get out of bed. This task had previously been performed by floor CNAs during the night shift.

Several months later, the bathing procedure was changed in response to a mandate from the State Health Department regarding "dignity issues." This mandate prohibited residents from being transported between their rooms and the shower facility while only wrapped in a sheet or robe. Where previously the residents were undressed and dressed in their rooms by the floor CNAs, the residents now had to be dressed and undressed in the shower room.

Rice was unhappy with these changes. Within the first few weeks of the bath team being responsible for the bed baths, Rice and Malone twice requested that the bed baths be reassigned to other staff members. Otts denied this request. Rice also believed that the floor CNAs were not

---

[1] It is unclear from the record when exactly this scheduling change was implemented.

doing their duties correctly, and voiced complaints to Judy Otts.[2]  According to Rice:

> A: I told her [Judy Otts] that – I told her once about them not coming and dressing the – they were supposed to come in and dress them. They wasn't doing it. She said, well, you tell that I said to – they supposed to be doing it. But they wouldn't do it.
> Q: Did you go back to her and say, hey, I told them and they're still not doing it, or did you –
> A: I did.
> Q: Okay. What did she do then?
> A: I mean, she never confronted it. She never confronted it.

According to Otts:

> A: Helen did not feel like that – she felt like it was too much work for the CNAs or the bath aides to be able to perform those duties. As with any other new policy or procedure that comes down, sometimes you have to work through the kinks to see what is going to be a true problem and what is not. Helen was not open at all to that, to the bath team doing that. She wanted the floor CNAs to dress them.
> . . .
> Q: During that time, did she ask you to give additional assistance to the bath team?
> A: Yes.
> Q: Okay. Did you decline to do that?
> A: I told her, at this time, until we see what the kinks were on this, that I was going to leave the bath team as it was.
> Q: So you did not give her any additional assistance.
> A: None other than to talk with the team on the floor and tell them that, you know, we had to pull together and try to work the timing out on this and get the team going.
> Q: During that time, were the bath aides on Helen's side both African-American?
> A: Yes.

Rice subsequently left the bath team in November 2009 and became a floor CNA.

---

[2]It is not clear from the record when Rice voiced this complaint or series of complaints.

In January 2010, Otts called a meeting of The Carrington staff. On that particular day,[3] the bath team consisted of two white CNAs. According to Rice:

> – and the white CNAs were there and the bath team that day. She called a meeting, told everybody to come to the nurses' station and she started telling us that we were going to have to start dressing these patients, your own patients. And I said, Judy, we don't have time to do that. We're trying to get people up for breakfast and we don't have time to do it. She responded, well, they tell me you don't help anybody anyway. Right – just in front of everybody. I said, where you get that information from? So it kind of – where did she get that from?

After the meeting concluded, Otts asked Rice to speak with her in her office. Kathy Keller and Chris Weaver, also employees of The Carrington, were asked to attend as witnesses. After a brief discussion about helping the bath team dress the residents, Rice stated:

> I said, by the way, when me and Jacq had the bath team, you didn't try to get us no help. We had to dress the people ourselves. I said, seems like you trying to make certain people jobs easier. And she say, get up. She said, I want you to go in Debbie's office and tell her what you just said.

Rice states she never explicitly mentioned race, only her belief that Otts was interested in helping "certain" or "some" people. According to Otts' recollection of this conversation, "The discussion was not going well and I believe I was called a racist and at that time, I stopped the conversation and I said, come with me. I had Chris and Helen to go to Miss White's office."

Rice, Otts, Weaver, and Kelly then went to the office of the Carrington Administrator, Deborah White. According to Rice, they then engaged in a respectful conversation during which Rice expressed her belief that "Judy had been on me ever since she had been there," and Otts responded that she had been receiving complaints from other staff members about Rice's attitude.

---

[3]It is unclear from the record the exact date this meeting took place. According to The Carrington's scheduling records, the only two days in January in which white CNAs made up both members of the bath team were January 22 and January 31.

4

Rice also expressed her opinion that Otts was trying to "make their job" easier, in reference to the white CNAs. In her deposition, Rice stated:

> Q: Did you bring up anything – [regarding race]
> A: Just the fact that I felt like she was trying to make their job easier.
> Q: Their being the bath team?
> A: The two that was there that day, the two white CNAs that was doing baths that day.

Rice left the meeting feeling satisfied that her complaints had been heard. According to Rice, that was the last discussion she had with Otts about the bath team.

On the morning of March 12, 2010, Rice was involved in an incident with another African-American CNA, Virginia Boyd. Rice's version of the incident is as follows:

Rice and Boyd were tasked with passing out the trays containing the residents' breakfasts. Some of the residents received their breakfasts in the dining room, while others had to be served in their rooms. Rice was transporting a resident to the dining room when she saw Boyd sitting in a chair. She said, "Virginia, you know you're supposed to be working down the hall and I'm supposed to be passing out trays in here." Boyd became angry and stated she would not be working on the hall and threatened to call Otts. Rice left the dining room and went back into the hall, where she began telling the night-shift nurses what was said in the dining room. Boyd followed her into the hall and and angrily accused Rice of talking about her, and called her a "bird face." Rice walked off again. Boyd walked another resident back to the dining room. Soon afterwards, the breakfast trays for the residents in their rooms (the hall trays) arrived, and Rice passed them out to the residents in their rooms. Meanwhile, Boyd was passing out the trays in the dining room.

After Rice had finished passing out the hall trays, she went back into the dining room where approximately 30 residents were seated. Danielle Price, another Carrington employee, came in and

5

asked who was supposed to be passing out the trays in the hall. At around the same time, Virginia Kimbrough, the nurse supervisor, walked in the dining room. Rice pointed at Boyd, and Boyd began screaming at Rice. Rice states that at no time did she ever raise her voice to Boyd. According to Rice, she began telling Kimbrough what Boyd's responsibilities were regarding passing out the trays while Boyd tried to yell over her. Kimbrough eventually told Rice and Boyd to follow her to her office. After speaking with Otts, Kimbrough suspended both Rice and Boyd pending an investigation into the incident. Judy Otts arrived at work later that morning and began interviewing the employees who witnessed the incident. Each employee interviewed wrote a statement describing their involvement and what they witnessed. Chris Weaver, the Carrington's social service director, interviewed the residents who were present during the incident to determine if any had been emotionally upset, which would have necessitated a report to the State. No resident responded being upset by the argument.

The investigation produced multiple statements, including Kimbrough's (the nurse supervisor) which contradicted Rice's account. In particular, Kimbrough stated that Boyd and Rice were both arguing loudly in the dining room about who was going to stay in the dining room and who would stay in the hall. According to Kimbrough, she attempted to intervene and stop the argument but "neither employee would stop and listen." Eventually, she was able to get them to follow her out of the dining room, but Rice and Boyd continued to argue loudly. According to Kimbrough's statement, "[a]ll along, this nurse was instructing them both to calm down and lower their voices. Both CNAs continue[d] to ignore this nurse's instructions to calm down and lower their voices." Other employees present also gave statements to the effect that Rice and Boyd both engaged in a loud argument in the dining room.

On March 15, Otts and White met to discuss the results investigation. Because neither was present during the incident, White brought in Kimbrough (who was in charge of the building at the time of the incident) and asked her what disciplinary action she believed was appropriate. Kimbrough replied that she though both employees should be terminated. Otts and White agreed with the decision, and Rice was terminated on the same day. The termination notice lists the reason as "(fighting) had a loud aggressive verbal altercation [illegible] a fellow employee in front of residents." Otts called Boyd to inform her that she was also terminated; however, Boyd claimed that she quit as she walked out on the morning of the incident.

Rice filed the instant suit on July 28, 2010, alleging that she was terminated in retaliation for her complaints to Otts in January 2010.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmovant." Agnew v. Washington Mut. Fin. Group, LLC, 244 F. Supp. 2d 672, 675 (N.D. Miss. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an

adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." Oliver v. Scott, 276 F.3d 736, 744 (5th Cir. 2002).

The Court is not to weigh the evidence or engage in credibility determinations. Anderson, 477 U.S. at 249, 106 S. Ct. 2505; Deville v. Marcantel, 567 F.3d 156, 164 (5th Cir. 2009). "[T]he court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." Deville, 567 F.3d at 164.

## DISCUSSION

Rice claims she was terminated in retaliation for her earlier complaints to Judy Otts. Title VII retaliation claims are governed by the familiar McDonnell Douglas framework. A plaintiff first must establish a prima facie case of retaliation by showing that: (1) she engaged in an activity protected by Title VII; (2) she was subjected to an adverse employment action; (3) a causal link exists between the protected activity and the adverse employment action. See Stewart v. Mississippi Transp. Comm'n, 586 F.3d 321, 331 (5th Cir. 2009). If the plaintiff makes out a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. Aryain v. Wal-Mart Stores Tex. LP, 534 F.3d 473, 484 (5th Cir. 2008). Once the employer does so, the burden shifts back to the plaintiff to offer evidence demonstrating a genuine issue of material fact that (1) the defendant's reason is not true, but is instead a pretext for retaliation (pretext alternative), or (2) the defendant's reason, though true, is only one of the reasons for its conduct, and another motivating factor is retaliation for the plaintiff engaging in protected activity (mixed-motives alternative) Rachid v. Jack in the Box, Inc., 376 F.3d 305, 312 (5th Cir.

8

2004); see also Smith v. Xerox Corp., 602 F.3d 320 (5th Cir. 2010). The Plaintiffs' burden at this stage is to prove that "but for" the protected activity, the adverse employment action would not have occurred. Hernandez v. Yellow Transp. Inc., 641 F.3d 118, 129 (5th Cir. 2011).

I.      Prima Facie Case

The Carrington argues that Rice is unable to demonstrate that she engaged in an activity protected by Title VII, and therefore is unable to establish a prima facie case of retaliation. The Court agrees. Under Title VII, an employee has engaged in protected activity if she has (1) "opposed any practice made an unlawful employment practice by this chapter," (the opposition clause) or (2) "made a charge, testified, assisted, or participated in an investigation, proceeding, or hearing under this subchapter" (the participation clause). 42 U.S.C. § 2000e-3(a); Byers v. Dallas Morning News, Inc., 209 F.3d 419, 427-28 (5th Cir. 2000). Here, the participation is not implicated because Rice did not file a charge with the EEOC until after the allegedly retaliatory discharge took place. To satisfy the "opposition clause," Rice does not have to prove that the Carrington's practices were actually unlawful; however, she must still show she had a "reasonable belief that the employer was engaged in unlawful employment practices." Byers, 209 F.3d at 428 (quoting Payne v. McLemore's Wholesale & Retail Stores, 654 F.2d 1130, 1140 (5th Cir. 1981)); see also Ellis v. Compass Group USA, Inc., 426 F. App'x 292, 296-97 (5th Cir. 2011) ("For her actions to satisfy the opposition clause, [plaintiff] must have had an objectively reasonable belief that [her employer] was engaged in unlawful employment practices.").

Here, even viewing the evidence in the light most favorable to Rice, she has failed to show an objectively reasonable belief that the Carrington was engaged in an unlawful employment practice. According to Rice:

> [Rice] complained about racially discriminatory treatment because she had asked for additional assistance on the bath team when she and Jacqueline Malone, both African America, had been assigned to the bath team. Judy Otts did not offer her and Ms. Malone additional help. When Helen left the bath team, however, and the bath team was made up of white CNAs, Judy Otts went so far as to have an in-service training to be certain that the other staff members at The Carrington knew they should assist the bath team. Helen was upset and felt she had been discriminated against based on her race because the exact sort of help which was denied to her and Ms. Malone was provided to the white CNAs.

However, The Carrington points out that the bath team was made up of both black and white CNAs before and after Rice left the bath team. The Carrington's scheduling records show that from September 1, 2009 until November 29, 2009 (when Rice last regularly worked on the bath team), a white employee was staffed on the two-person bath team 50% of the time. From November 30, 2009 until January 31, 2010 (the time period during which Rice felt Otts was trying to make the jobs of the white CNAs on the bath team easier), a black CNA was staffed on the bath team nearly every shift. From the time Rice left the bath team on November 30, 2009, until her termination on March 15, 2010, a black CNA was on the bath team 87.5% of the time.

Rice fails to dispute this,[4] and instead only alleges that "[Otts's] own testimony contradicts that argument" and "Otts herself admitted to treating white and black CNAs differently." However, this is a mis-characterization of Otts' deposition testimony[5] and fails to establish the reasonableness

---

[4] Rice acknowledged in her deposition that she worked with both black and white CNAs after the bath team was placed on a seven-day rotation.

[5]  
Q: When Helen Rice and the other African-American aide or CNA were on the bath team, did you do any in-service then to tell other people they needed help?
A: I don't recall specifically. I did numerous in-services trying to pull the teams together and to implement polices.
Q: But you do recall specifically doing it when there were white CNAs on the team?
A: I do.

of Rice's belief that The Carrington was engaged in discrimination based on race. Even viewing the evidence in the light most favorable to Rice, the Court finds that Rice has failed to present sufficient evidence showing that her complaints of Otts' race discrimination were objectively reasonable. See Byers, 209 F.3d at 429. In other words, Rice has failed to establish the reasonableness of her belief that Otts or The Carrington were engaged in an unlawful employment practice or otherwise treating the white and black CNAs differently by changing the bathing procedure or instructing the floor CNAs to assist the bath team. Accordingly, the Court finds that the opposition clause requirements have not been satisfied, and Rice has failed to establish a prima facie case of unlawful retaliation. Therefore, Defendant is entitled to summary judgment. However, out of an abundance of caution, alternatively and assuming arguendo that Rice had established a prima facie case, the Court will proceed to address the second and third prongs of the McDonnell Douglas framework.

II.     Legitimate Non-Retaliatory Reason

The Carrington offers the following legitimate, non-retaliatory reason for terminating Rice: that Rice engaged in a loud argument with another employee in front of facility residents. The Court finds this to constitute a valid, non-retaliatory reason for the employment action, satisfying its burden of production.

III.    Pretext

The Carrington having offered a valid, non-retaliatory reason for the employment decision, the burden now shifts back to Rice to offer evidence demonstrating a genuine issue of material fact

---

Even viewing this testimony in the light most favorable to Rice, it does not constitute an admission on the part of Otts "to treating white and black CNAs differently."

11

that (1) the defendant's reason is not true, but is instead a pretext for retaliation (pretext alternative), or (2) the defendant's reason, though true, is only one of the reasons for its conduct, and another motivating factor is retaliation for the plaintiff engaging in protected activity (mixed-motives alternative) Rachid v. Jack in the Box, Inc., 376 F.3d 305, 312 (5th Cir. 2004); see also Smith v. Xerox Corp., 602 F.3d 320 (5th Cir.2010). Here, Rice argues that The Carrington's stated reason for her termination is false and a pretext for unlawful retaliation.[6] A Plaintiff may show pretext "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." Jackson v. Cal-Western Packaging Corp., 602 F.3d 374, 378-79 (5th Cir. 2010) (quoting Laxton v. Gap, Inc., 333 F.3d 572, 578 (5th Cir. 2003)). The Plaintiff's burden at this stage is to "prove that the protected conduct 'was a but for cause of the adverse employment decision.'" Hernandez, 641 F.3d at 129 (citations omitted). A plaintiff may avoid summary judgment on "but for" causation by demonstrating a conflict in substantial evidence

---

[6]Rice fails to specifically argue that the mixed-motives alternative is applicable to this case. However, in the portion of her brief discussing the causal link element of her prima facie case, Rice states "Plaintiff need only show retaliation is a substantial contributing cause and need not meet any 'but for' test. Smith v. Xerox, 602 F.3d 320 (5th Cir. 2010)." While this is true as far as the causal link element of a prima facie goes, see Long v. Eastfield College, 88 F.3d 300, 305 n.4 (5th Cir. 1996) (discussing the inapplicability of the "but for" test to the causal link element of a prima facie case), the Xerox case does not discuss this distinction. Instead, Xerox held that the mixed-motives framework applies to Title VII retaliation cases and dispensed with the previous requirement that a plaintiff offer direct evidence of discrimination in order to proceed on the mixed-motive theory. Xerox, 602 F.3d at 332. However, even under the mixed-motives framework, the plaintiff still has the ultimate burden of demonstrating but for causation. See Nunley v.City of Waco, 2011 WL 3861678, at *5 (5th Cir. Sept. 1, 2011) ("Thus, our decision in Xerox did not dispense with this final 'but for' requirement for avoiding summary judgment."). To the extent the above quoted portion of Plaintiff's brief is an attempt to raise the mixed-motives theory of proof, the Court finds this is insufficient. However, in the alternative, to the extent that Rice has raised the mixed-motive alternative, the Court finds that Rice has failed to provide "substantial evidence supporting a conclusion that both a legitimate and an illegitimate (i.e, more than one) motive may have played a role in the challenged employment action." Xerox, 602 F.3d at 333.

on this ultimate issue. Id. at 132 (citations omitted). Evidence is substantial if it is "of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." Id. Rice offers the following evidence of pretext:[7]

First, Rice points to the timing between Rice's complaint to Judy Otts and her subsequent termination, which occurred approximately three months later. Close timing between an employee's protected activity and an adverse action against the employee may provide the causal connection needed to make out a prima facie case of retaliation. McCoy v. City of Shreveport, 492 F.3d 551, 562, n.28 (5th Cir.2007). However, temporal proximity, standing alone, is insufficient demonstrate pretext at this stage of the McDonnell Douglas analysis. Strong v. Univ. Healthcare Sys., LLC, 482 F.3d 802, 808 (5th Cir. 2007); McCoy, 492 F.3d at 562 (5th Cir. 2007).

Rice next contends that "Otts . . . was so frustrated by the accusation that she talked about it 'multiple times' with Deborah White . . . . White, too, admitted that [Otts] brought the issue up with her several times." During Otts' deposition, Rice's counsel asked the following:

> Q: Did you ever talk with Miss White about it again other than that one time?
> A: Oh, yes.
> Q: Okay. Multiple times?
> A: Miss White and I – like I said, in our positions we talk very often about issues with employees or on the floor.
> . . .
> Q: But after you understood Mrs. Rice to accuse you of racism, you discussed that multiple times with Miss White.
> A: I discussed it with her and as I said, it was more frustrating because I'm not racist and it's just frustrating to be seen that way.

However, the fact that Otts discussed Rice's complaint more than once with Deborah White and felt

---

[7]Several of these arguments were advanced to establish the "causal link" element of Rice's prima facie case, rather than "but for" causation, but the Court shall consider them together.

frustrated, while relevant, is insufficient to demonstrate causation or connect Rice's termination to her earlier complaints to Otts.

Rice next argues that evidence of pretext can be found in the fact that prior to the Boyd incident, "no one associated with The Carrington had complaints about Helen's work, and Helen had been employed with the facility for six (6) years." However, this is contradicted by Rice's employment records which reflect that Rice had been disciplined numerous times over the course of her employment with The Carrington.

Rice next points out that The Carrington's own investigation revealed that no resident was alarmed or upset by the incident between Rice and Boyd. However, this is not probative as to whether The Carrington's reason for Rice's termination is pretextual. As Rice acknowledged in her deposition, The Carrington's employment policies provide that "[p]rofessional attitude, conduct, and manners are required of all employees at all times" and "[a] quiet and dignified atmosphere must prevail throughout the facility." The Carrington is not required to wait until an employee's conduct actually alarms or upsets a resident (which would necessitate reporting to the State) before taking corrective action.

Rice's primary argument is that an issue of material fact exists because she denies engaging in a loud argument with Virginia Boyd. Rice denied ever raising her voice to Virginia Boyd in her deposition, and instead contends that she turned her back and attempted to walk away from Boyd. She also points to the testimony of a former employee of The Carrington, Cassandra Gandy, who testified that Rice was not being loud. However, "simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext." LeMaire v. Louisian Dept. of Transp. and Dev., 480 F.3d 383, 391 (5th Cir. 2007). The Fifth Circuit Court of Appeals has

observed that the "existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification." Little v. Republic Refining Co., 924 F.2d 93, 97 (5th Cir. 1991) (citing Bienkowski v. Am. Airlines, Inc., 851 F.2d 1503, 1507 (5th Cir.1988)).

In the case of Jackson v. Cal-Western Packaging Corp., 602 F.3d 374 (5th Cir. 2010), an employee who was terminated over allegations of sexual harassment claimed his firing was a pretext for age discrimination based in part upon his denial of committing any misconduct. Id. at 379. The Fifth Circuit explained:

> Jackson's self-serving statements that he did not commit sexual harassment are insufficient to create a triable issue of fact as to whether Cal-Western fired him because of his age. In cases in which an employer discharges an employee based on the complaint of another employee, the issue is not the truth or falsity of the allegation, but whether the employer reasonably believed the employee's allegation and acted on it in good faith. Cal-Western was faced with considerable evidence that Jackson was violating the company's sexual harassment policy. The evidence came from several employees, both male and female, and was substantiated by both an internal and external investigation of Jackson's behavior. Jackson has presented no evidence as to why the company's reliance on the evidence against him was in bad faith. His own conclusory assertion that he did not behave inappropriately is irrelevant, since he has provided no evidence to suggest that Cal-Western's decision to trust the results of the two investigations, rather than his self-serving denial of wrongdoing, was unreasonable or in bad faith. Jackson's assertion of innocence alone does not create a factual issue as to the falsity of Cal-Western's proffered reason for terminating him.

Id. (footnotes, citations, and quotations omitted).

Here, during the course of the investigation conducted by Judy Otts, numerous Carrington employees, including nursing supervisor Virginia Kimbrough, reported that Rice and Boyd engaged in a loud argument in front of the residents in the dining room. Rice cannot show pretext by her own self-serving denial of engaging in the misconduct alleged. To the extent that Plaintiff relies on the

15

deposition testimony of former Carrington employee Cassandra Gandy that Rice was not being loud as evidence of her innocence of the underlying misconduct, the Court would note that this information was not provided in the statement[8] Gandy made following the investigation, and in any event, would not establish a genuine issue of *material* fact. See Little, 924 F.2d at 97.

Rice also points to a statement in Gandy's deposition wherein Gandy testified that shortly after the incident occurred, "Virginia Kimbrough told me that she told Judy that it wasn't Helen Rice that was causing the problem, it was Virginia Boyd." However, even assuming that this double hearsay statement is admissible,[9] this is insufficient to raise an issue of material fact as to whether The Carrington's stated reason for Rice's discharge was a pretext for retaliation. The alleged verbal statement by Kimbrough to Gandy does little to undermine the facts stated in Kimbrough's written statement (corroborated by other employees) in which she averred that both employees were arguing loudly and refused to stop after being instructed to do so. Nor does it contradict the later deposition testimony of Otts, White, and Kimbrough that, following the investigation, Kimbrough recommended both employees should be terminated. While the Court is obligated at this stage to view all evidence in the light most favorable to the Plaintiff and draw all reasonable inferences in her favor, it would be unreasonable to infer from Gandy's statement that Otts or The Carrington

---

[8]Gandy's handwritten statement reads: "Virginia K, Helen Rice [and] Virginia Boyd [and] I went into the front office [and] Virginia K. stated what the staff should have done in this situation [and] ask [sic] to hear what happen [sic]. Helen [and] Virginia Boyd both stated their side [and] Virginia K. addressed each concern [and] Virginia Boyd stated that she would do what Virginia K. ask [sic] her to do. No physical altercation noted or abusive language."

[9]The statement could arguably fall within the party opponent exception to the hearsay rule, although the issue has not been adequately briefed by either side. FED. R. EVID. 801(d)(2)(D); Ramirez v. Gonzalez, 225 F. App'x 203 (5th Cir. 2007). For the purposes of this opinion, the Court assumes without deciding that Kimbrough made the alleged statements to Gandy (and Otts) while acting within the scope of her employment.

coerced or manipulated Kimbrough and the other witnesses into manufacturing the allegations against Rice in retaliation for her earlier complaint to Judy Otts.  Like the Plaintiff in <u>Jackson</u>, Rice has brought forward no evidence to suggest that The Carrington's decision to believe the evidence of Rice's misconduct was unreasonable or in bad faith.   After careful consideration of the record in this case as a whole, the Court concludes that Rice has failed to establish a genuine issue of material fact as to whether The Carrington's stated reason for her termination was a pretext for retaliation.  Therefore, Defendant is entitled to summary judgment.

## CONCLUSION

Defendant's Motion for Summary Judgment is GRANTED, Plaintiff's claims are dismissed, and this case is CLOSED.

SO ORDERED on this, the 24th day of January, 2012.

                                                                     /s/ Sharion Aycock
                                                                  **UNITED STATES DISTRICT JUDGE**